# UNITED STATES DISTRICT COURT
### for the
District of Alaska

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| KIT LEE KARJALA and | ) Case No. 3:17-mj-00214-KFM |
| CHRISTOPHER BRANDON MILLER, aka: "Mellow," | ) |
| | ) |
| | ) |
| *Defendant(s)* | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 2016 - the present_____ in the county of _____ in the _____ District of _____Alaska_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 USC § 846 | Drug conspiracy |
| 21 USC §§ 841(a)(1), (b)(1)(C) | Distribution of, and possession with intent to distribute, controlled substances |
| 18 USC §§ 1791(a), (b)(2), (b)(4) | Providing and possessing contraband in a prison |

This criminal complaint is based on these facts:

See attached affidavit, which hereby incorporated fully by reference herein.

☑ Continued on the attached sheet.

Signature Redacted

_____
*Complainant's signature*

Richard Fuller, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

/s/ Kevin F. McCoy
United States Magistrate Judge
Signature Redacted

Date: _____05/10/2017_____

_____
*Judge's signature*

City and state: _____Anchorage, Alaska_____

Hon. Kevin F. McCoy, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:17-mj-00214-KFM |
| | ) |
| **KIT LEE KARJALA and** | ) |
| **CHRISTOPHER BRANDON MILLER,** | ) |
| **aka: "Mellow,"** | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Your affiant, Richard Fuller, a Special Agent with the Federal Bureau of

Investigation (FBI), assigned to the Anchorage Field Office, having been duly

sworn, deposes and states as follows:

### Introduction

1.      This affidavit is submitted in support of a criminal complaint

charging **KIT LEE KARJALA** and **CHRISTOPHER BRANDON MILLER**

with conspiracy to distribute and to possess with the intent to distribute a

controlled substance, in violation of 21 U.S.C. § 846; distribution of, and

possession with intent to distribute, a mixture and substance containing a

detectable amount of heroin, and a detectable amount of Suboxone (a controlled

narcotic containing the active ingredients buprenorphine and naloxone, which is

prescribed to treat opioid addiction), in violation of 21 U.S.C. §§ 841(a)(1)

*KFM*

MAY 1 0 2017

(b)(1)(C); and providing and possessing contraband in a prison, in violation of 18 U.S.C. §§ 1791(a), (b)(2), (b)(4).

2.      By way of background, I have been a Special Agent with the FBI since February 2012 and I am currently assigned to the Anchorage Field Office. Since becoming a Special Agent with the FBI, I have participated in numerous federal, state and local investigations involving complex financial crimes, including health care fraud and public corruption, drug trafficking, and money laundering. Many of these investigations have resulted in convictions for violations of federal and state crimes. I have had experience in numerous debriefings of criminal defendants, witnesses, confident human sources, and others.

3.      The facts and information contained in this affidavit are based upon my personal knowledge of this investigation, as well as information obtained from other federal and state law enforcement officers and Alaska Department of Corrections (DOC) personnel, including but not limited to information derived through surveillance, interviews, and analysis of various types of records. All observations referenced in this affidavit that were not made by me were relayed to me by the person(s) who made such observations. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only and are not intended to be a verbatim recitation of such statements. Additionally, wherever statements made by individuals appear in quotation marks in this affidavit, those transcripts/summaries of those statements,

are subject to further revision. I have not set forth each and every fact related to this investigation, but instead have included enough facts to establish probable cause. I request that this Court rely solely upon facts set forth herein in considering this affidavit in support of a criminal complaint.

## The Defendants and the Conspiracy

4.     KIT LEE KARJALA (KARJALA) is an active member of the Alaska Bar Association, having been admitted in 2002. KARJALA is a private criminal defense attorney in Anchorage, Alaska, who has her own law office (*i.e.*, Kit L Karjala Attorney at Law).

5.     Since 2/8/16, CHRISTOPHER BRANDON MILLER (MILLER) has been an inmate at DOC's Anchorage Correctional Complex (ACC).[1] KARJALA represents MILLER and is his counsel of record in several state criminal cases that are pending before the State of Alaska's Superior Court, Third Judicial District, Anchorage Division. *See* 3AN-16-01248CR; 3AN-10-13243CR; 3AN-10-13158CR; 3AN-10-12957CR.

6.     In sum, the conspiracy detailed herein involves KARJALA conspiring with MILLER and other inmates, as well as others known and unknown, to smuggle drugs into ACC for distribution to inmates. Beginning as early as June 2016 and no later than December 2016, and continuing until the

---

[1] ACC is, among other things, a "prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the Attorney General" and therefore a "prison" for purposes of 18 U.S.C. § 1791.

MAY 1 0 2017

present, KARJALA passed packaged drugs to her co-conspirator and other inmates during in-person attorney-client visits. To be clear, federal and state court databases show that KARJALA did not in fact represent all of those inmates. After KARJALA handed the co-conspirator inmate the drugs, the inmate secreted the drugs inside their body, most commonly by inserting the drugs into their anus, while KARJALA shielded the inmate from view. Following the visit with KARJALA, the co-conspirator inmate transported the drugs inside their body back to their jail cell and later distributed the drugs to other ACC inmates.

## Facts

### Three-way calls to KARJALA on 12/11/16 and 12/14/16 from Inmate A and his drug associate

7.      Inmate A was detained at ACC-East in December 2016 related to federal drug charges. (ACC is comprised of two separate buildings, which are commonly referred to as "ACC-West" and "ACC-East," respectively.) KARJALA did not represent Inmate A in his federal case, nor is there any indication that KARJALA ever represented Inmate A.

8.      By way of background, DOC's inmate telephone management system, Securus, places certain limitations on calls that DOC inmates may place. For instance, DOC permits inmates to place outgoing calls to phone numbers that are registered by Securus. To register a phone number in the Securus system, an individual must provide, among other information, their name and certain identifying information. Additionally, when an inmate places a call to a registered

4 of 33

Case 3:17-cr-00063-TMB-KFM   Document 1   Filed 05/10/17   Page 5 of 34

MAY 10 2017

number, Securus plays an automated message that advises the inmate and the called party that they are receiving a call from a DOC inmate and that the call is subject to recording and monitoring.[2] DOC does not allow inmates to initiate three-way calls. To circumvent these limitations, inmates can call a number that is registered in Securus and have the party using the registered number thereafter initiate a conference call to a third individual by dialing that number (hereinafter "three-way calls"). Among other things, these three-way calls enable an inmate to communicate with individuals whose phone numbers are not registered in Securus and to listen to calls between the individual initiating the three-way call and the third party, with or without the third party's knowledge. Based on my training and experience and my conversations with other investigators and DOC personnel, inmates commonly conduct three-way calls to communicate individuals whose numbers are not registered in Securus and/or to conceal from DOC that they are communicating with certain individuals.

9.      On 12/11/16, DOC's inmate telephone management system, Securus, recorded a telephone conversation between Inmate A and a female drug associate of Inmate A (Inmate A's drug courier), in which Inmate A and his drug courier attempted to speak with KARJALA telephonically. An analysis of the 12/11/16 call reveals that Inmate A used his drug courier to try and initiate a three-way call with

---

[2] Securus does not record calls placed by DOC inmates to any telephone number that is registered in the Securus system by an attorney, and identified as an attorney's number.

MAY 10 2017

KARJALA. The conversation, conducted beginning at 9:08am on 12/11/16, is summarized below:

    a. Inmate A calls his drug courier, who in turn attempts to conduct a three-way call with KARJALA.

    b. At 00:42 seconds into the call, Inmate A says to his drug courier: "It's 5460." (Agent's note: Based on this investigation, I believe Inmate A was referring to KARJALA's cellular telephone number because its last four digits are 5460.)

    c. At 1:04 into the call, Inmate A's drug courier says: "when I am on the phone with her baby, don't talk, 'cause it freaks her out." Inmate A replies, "yep."

    d. At 1:21 into the call, a voice message greeting is heard that states, "hello and thank you for calling Kit Karjala attorney at law."

    e. At 1:34 into the call, Inmate A's drug courier asks him, "leave a message?" Inmate A responds, "just hang up."

10. On 12/14/16, Inmate A and his drug courier conducted a three-way call with KARJALA that was recorded through the Securus system. Review of this recording revealed that KARJALA and Inmate A's drug courier (acting at Inmate A's direction) were coordinating a delivery of illicit drugs to Inmate A inside ACC-East. The conversation, conducted beginning at 11:55am on 12/14/16, is summarized below:

    a. Inmate A calls his drug courier. After they speak for a few minutes, Inmate A's drug courier initiates a three-way call with KARJALA. (Agent's note: After Inmate A's drug courier calls KARJALA and initiates the three-way call, Inmate A is silent. Thus, there is no indication that KARJALA was aware that Inmate A was listening to

her conversation with Inmate A's drug courier.)

b. At approximately 4 minutes into the call KARJALA says, "Hello."

c. At 4:06 into the call Inmate A's drug courier says, "I am supposed to drop something off for jail."

d. At 4:10 into the call KARJALA asks, "Is this 891?" Inmate A's drug courier responds, "yeah, my other number." KARJALA then says, "I always refer to you as 891." (Agent's note: During the call on 12/11/16 described above, Inmate A called Inmate A's drug courier at a phone number whose first three local digits were 891, *i.e.*, 907-891-XXXX.)

e. At 5:02 into the call, KARJALA asks, "Is this Hetty?" Inmate A's drug courier replies, "no...same people, but yeah." (Agent's note: Based on the investigation conducted to date, I believe that the Hetty that KARJALA asks about is an associate of another inmate who was incarcerated at ACC-East in December 2016.)

f. At 5:11 into the call, Inmate A's drug courier asks KARJALA, "When can I meet you?"

g. At 5:52 into the call, Inmate A's drug courier asks, "What's a convenient time for you [to meet]?" KARJALA replies, "I don't have any court today."

h. At 7:23 into the call, KARJALA says, "I'm in Muldoon, where are you?" (Agent's note: This investigation has established that Kit KARJALA lives near the intersection of Muldoon Road in Anchorage, Alaska.)

i. At 7:31 into the call, KARJALA asks, "do you want me to come and meet you?"

j. At 8:00 into the call KARJALA asks, "Now is he [Inmate A] back in Matsu or is he [Inmate A] here?" KARJALA then asks, "He's

MAY 10 2017

here?" Inmate A's drug courier says, "Yes."

k.  At 8:14 into the call, KARJALA asks Inmate A's drug courier, "how many pieces of paper did he [Inmate A] . . . he said 103 or some weird number like that…. right?" Inmate A's drug courier responds by saying, "I'm not sure, I got to talk to him [Inmate A] real quick." KARJALA replies, "I thought he [Inmate A] told me 103…he [Inmate A] said you weren't going to pack them…he [Inmate A] said you weren't going to package them up, that I would have to." Inmate A's drug courier states, "no, I got it….I will have everything ready for you." KARJALA responds, "you do…cause I have someone lined up to do that." (Agent's note: Based on the investigation conducted to date and my training and experience, I believe that KARJALA's references to "103 papers" was to 103 Suboxone strips and her inquiries regarding packaging or packing were to whether the drugs would need to be packaged before she smuggled them to Inmate A. In addition, I believe that the reason KARJALA asked about the drugs being packaged was so Inmate A could secrete the drugs in his anal cavity after she passed the drugs to avoid detection by DOC personnel.)

l.  At 9:20 into the call, KARJALA says, "When you are done, just give me a call." Inmate A's drug courier then states, "Yes ma'am." KARJALA says, "I will talk to you soon." At that point, KARJALA's phone is heard disconnecting/hanging up with Inmate A's drug courier.

m.  At 10:04 into the call, Inmate A's drug courier addresses Inmate A, who is still on the line, and asks "why did we do that?" (Agent's note: I believe Inmate A's rhetorical question was a reference to placing the aforementioned conversation over a call recorded by Securus.) Inmate A responds simply, "Alright, so the 103 of what she is talking about." Inmate A's drug courier replies, "she's picking up Payton's presents." Inmate A replies, "Yeah." Inmate A's drug courier says, "I will just go get them gift wrapped at the store." Inmate A responds, "Ok." Later in the conversation, Inmate A states, "Hetty has the 103." At that point, Inmate A's drug courier

MAY 10 2017

interrupts Inmate A and says, "Yeah, yeah, I got that." (Agent's note: Based on the investigation conducted to date and my training and experience, I believe that after KARJALA hangs up with Inmate A's drug courier, Inmate A and his courier spoke in code to try to disguise the true illicit nature of this conversation.)

### *KARJALA and Inmate B's 1/13/17 meeting*

11.     Inmate B was currently incarcerated at ACC-East 1/13/17, related to, *inter alia*, federal drug charges. KARJALA did not represent Inmate B in his federal case, nor is there any indication that KARJALA ever represented Inmate B in any state or federal matter.

12.     A review of the Alaska Corrections Offender Management System (ACOMS), DOC's database system, which DOC uses to track booking, visits, banking, and other information regarding inmates, shows that KARJALA had at least seven professional visits with Inmate B at ACC between June 2016 and February 2017.

13.     For example, on 1/13/17, KARJALA visited Inmate B for roughly 34 minutes at ACC-East, beginning at approximately 11:58am. Because KARJALA requested a professional visit with Inmate B, DOC permitted KARJALA to meet with Inmate B in a room with no physical barriers separating them. The visiting room that they used has one door and one window, the latter of which is floor-to-ceiling, transparent, two-way glass that looks out to a hallway that connects the segregation unit to other parts of the facility. Per DOC procedure, a security camera captured video, but no audio, of the meeting. The

MAY 10 2017

KFM

security camera in the visiting room that KARJALA and Inmate B used on 1/13/17 is located inside a camera dome, which is visible upon entering the room in the room's far left upper corner. The video-only footage of KARJALA's 1/13/17 meeting with Inmate B is summarized below. (Agent's note: The times noted below are those reflected on the camera footage.):

    a. At 11:58am, Inmate B is escorted into the room by a corrections officer and looks directly at the camera. Inmate B is secured to a chain attached to the wall. Once the officer leaves the room, Inmate B places a chair directly in front of his chair and places his paperwork on the chair. The back of Inmate B's chair is facing the furthest wall from the door. He places the third chair in the room next to him with the chair's back angled so the back of it is facing the camera.

    b. At 12:03pm, KARJALA is escorted into the room by a corrections officer. She sits in the chair next to Inmate B, so her back is to the camera.

    c. From approximately 12:03pm to 12:09pm, Inmate B and KARJALA appear to talk and pass paperwork back and forth between one another.

    d. At 12:09:50pm, KARJALA, who is sitting with her back to the camera and her left leg crossed over her right leg, appears to use her right hand to reach up her left pant leg. Immediately after reaching up her pant leg with her right hand, KARJALA places her right hand on some papers she has in her lap. Without moving her right hand, KARJALA takes her left hand, which has paperwork in it, and places the papers she is holding in her left hand over the paperwork in her right hand. KARJALA then appears to place an item between the two stacks of paperwork from her right hand.

    e. At 12:10:05pm, KARJALA hands Inmate B the stack of paperwork and does so in a manner that makes it appear that she is concealing something under the paperwork. Inmate B grabs the paperwork with his left hand under KARJALA's left hand and then appears to read the paperwork.

f. At 12:10:16pm, Inmate B briefly moves the stack of paperwork in his hands with his right hand. His left hand is fully exposed and appears to be holding onto an item.

g. At 12:10:21pm, Inmate B grabs additional paperwork and a large manila envelope. He places the envelope and paperwork on his lap under the paperwork he received from KARJALA. Inmate B then crosses his right leg over his left leg so that his right ankle is resting on his left thigh and adjusts his seating position by scooting lower in his chair so his backside appears to be nearly at the front edge of the chair.

h. At 12:10:38pm, Inmate B places his left hand under all the paperwork that he is holding in his right hand over his lap. At that point, Inmate B starts moving his left arm around in his lap area underneath the papers he is holding in his right hand. It appears Inmate B is concealing what he is doing with his left hand with the paperwork. Inmate B's movement is consistent with him secreting something in his anal cavity. (Agent's note: From talking with inmates and DOC security sergeants and reading DOC reports, your affiant knows that inmates commonly hide contraband in their anal cavity at ACC and other DOC facilities.)

i. At 12:11:44pm, Inmate B appears to have completed concealing the item(s), as his left hand is visible handling the paperwork on his lap.

j. At 12:13:22pm, Inmate B appears to wipe something off his left fingers. (Agent note: Based on the investigation conducted to date, I know that DOC inmates use different forms of grease to lubricate items they place in their anal cavity.)

k. At 12:16pm, Inmate B stands up and the first thing he does is pull up his pants which appear to be very low on his legs.

l. At 12:18pm, KARJALA is escorted out of the room by a corrections officer.

m. At 12:19pm, Inmate B is put in hand restraints and escorted into the segregation unit.

n. After Inmate B is removed from the visiting room, out of view of the camera, the corrections officer strip searched Inmate B's person and searched his clothing, but found no contraband. The officer placed

Inmate B back in his cell. No search was conducted of Inmate B's anal cavity.

### KARJALA and MILLER's 2/22/17 meeting

14. On 2/22/17, KARJALA visited inmate MILLER at ACC-East for approximately 1 hour and 15 minutes beginning at approximately 8:52pm.[3] Because KARJALA requested a professional visit with MILLER, DOC permitted KARJALA to meet with MILLER in a room with no physical barriers separating them. The visiting room was the same visiting room that KARJALA and Inmate B met on in 1/13/17 described above. (Agent's note: The times noted are those reflected on the camera footage.):

   a. At 8:52pm, KARJALA is escorted into the visiting room by a DOC corrections officer. Once KARJALA is in the room alone, she repositions the three chairs in the room. KARJALA places one chair for MILLER next to the wall that has built-in inmate restraints, facing the hallway and with its back to the security camera. KARJALA places a second chair for herself next to MILLER's chair facing the same direction. KARJALA placed the third chair in front of the other two, closer to the hallway and facing the opposite direction, with its back facing the door. This third chair acts as a table for the visit. KARJALA places her coat over the back of that chair.

   b. At 8:54, MILLER is escorted into the visiting room by a corrections officer and secured to the wall restraint with his right ankle. MILLER adjusts his chair and seating so the front of his body is facing the camera.

   c. At 9:06pm, KARJALA hands MILLER paperwork and a folder that he places on his lap.

---

[3] FBI was not aware of the 2/22/17 visit between KARJALA and MILLER until after it occurred and MILLER had been escorted back to his jail cell.

MAY 10 2017

d. At 9:22pm, KARJALA moves the chair that is serving as a table closer to her chair and places her bag on top of the chair.

e. At 9:24pm, KARJALA opens a folder that has been resting on her lap. She reviews paperwork in her folder and shows documents to MILLER.

f. At 9:28:04pm, KARJALA's left leg is crossed over her right leg with her left ankle resting on her right thigh. KARJALA's right hand appears to be under the open folder of paperwork and it is moving back and forth. KARJALA pulls her right hand out from underneath the paperwork lying on her lap, lifts up some of the paperwork with her left hand and places her right hand in between the paperwork she lifted up and the paperwork on her lap.

g. As depicted in the below screen shot, at 9:28:24pm, KARJALA takes the paperwork that was originally in her left hand and hands it to MILLER using both her hands. (Agent's note: From the way KARJALA hands MILLER the paperwork, it appears KARJALA is ensuring that MILLER grabs an item(s) that is/are concealing something under the paperwork.)



//

//

//

KFM

MAY 1 0 2017

h.  At 9:28:25pm, MILLER takes possession of the paperwork from KARJALA. (Agent's note: It appears MILLER grabs the paperwork from KARJALA in a manner that indicates that he is securing an item(s) under the paperwork with his right hand.)

i.  At 9:28:40pm, MILLER keeps his right hand closed, in a clenched fist, just to the right of the paperwork he is handling with his left hand. Thereafter, MILLER attempts to hand the paperwork and folder back to KARJALA with his left hand while his right hand remains in the same position, resting in his lap with his fist still clenched. KARJALA takes the paperwork that is on top of the folder that MILLER is holding in his left hand. MILLER retains the folder in his left hand.

j.  As depicted in the below screen shots, beginning at 9:28:59pm, while still holding the folder in his left hand and facing KARJALA, MILLER proceeds to put his right hand down the front of his pants and underwear towards the center of his groin. He then lifts his legs and heels slightly off the ground, as he remains seated.



//

//

//



k. At 9:29:05pm, MILLER pulls his right hand out of his pants and appears to wipe his right hand on his upper pant leg. MILLER then holds the folder with both hands.

l. At 10:09pm, KARJALA is escorted out of the visiting room by a corrections officer.

m. At 10:15pm, a corrections officer enters the visiting room, removes the leg restraint from MILLER and escorts him out of the room.

15.    Shortly after 10:15pm on 2/22/17, the corrections officer escorted

MILLER back into the segregation unit and, consistent with DOC procedure, strip

searched MILLER and searched his clothing. No contraband was found on

MILLER.

### *KARJALA and MILLER's 3/16/17 meeting*

16.    On 3/16/17, KARJALA visited inmate MILLER at ACC-East for

approximately 1 hour and 36 minutes, beginning at approximately 5:30pm.

Because KARJALA requested a professional visit with MILLER, DOC permitted

KARJALA to meet with MILLER in a room with no physical barriers separating them. KARJALA and MILLER met in the same room they had used for the 2/22/17 meeting described above, and the same room where KARJALA had met with Inmate B on 1/13/17. No physical barriers separated them during the visit. The video-only footage of KARJALA's 3/16/17 meeting with MILLER is summarized below. (Agent's note: The times noted are those reflected on the camera footage.):

    a. At 5:30pm, KARJALA is waiting in the room alone when MILLER is escorted into the visiting room by a corrections officer and secured by an ankle restraint on the left side of the room, from the video camera's perspective. There were three chairs. KARJALA sat in the chair to the right side of the room with her back to the camera located in the right rear corner of the room. MILLER sat in the chair toward the left side of the room. MILLER and KARJALA sat in close proximity to one another. The third chair was located in front of KARJALA's chair with its back facing the door and was used as a table.

    b. As depicted in the screen shot below, at 6:16:49pm, KARJALA hands MILLER documents that he holds above his lap.



    c. At 6:19pm, MILLER's hand moves to a pocket on the left breast of his shirt. It appeared that MILLER placed something in the pocket.

d. At 6:23:38pm, KARJALA stands up and begins to appear to be looking for something inside the cell, moving in an animated fashion in an apparent effort to distract DOC personnel who might be watching the visit, and ultimately picks up an object between the chairs and the door.

e. At 6:23:51pm, MILLER stands up and faces away from the camera, so his backside is towards the camera. MILLER's pants are well below his rear end at this point, and his boxer shorts visible.

f. As depicted in the screen shots below, at 6:24:00pm, KARJALA continues to move about the cell as if looking for a lost item, and positions herself between MILLER, who is still facing away from the camera and the door, and the camera.



//

//

//

//

//

g. As depicted in the screen shot below, at 7:01:49pm, MILLER's hand moves to his mouth in what appeared to be covering a cough, and then MILLER's left hand appeared to be clutching a small item.



h. At 7:03pm, MILLER, now standing, was observed manipulating something in his hand with his fingertips and immediately placed his hands, containing the suspected item, behind his back.

i. At 7:03pm, MILLER appears to position himself against the wall in a standing position with his left leg lifted. At that time, MILLER appeared to be fidgeting with his hands behind his back out of sight. After a short time, MILLER took his hands from his back area and opened them, showing they contained nothing.

j. At 7:06pm, DOC ends the meeting. A corrections officer escorts KARJALA out of the interview room and, shortly thereafter, DOC personnel confront MILLER, and place MILLER in restraints to keep his hands from getting close to his backside.

17. After the above-described visit on 3/16/17 between KARJALA and

MILLER, KARJALA was permitted to leave ACC-East without questioning.

After KARJALA left, DOC personnel asked MILLER what the item was that they

KFM

MAY 1 0 2017

had just observed him put into his mouth and then appear to place in his anus during the meeting with KARJALA. MILLER denied having any contraband.

18.     On 3/16/17, a federal search warrant was obtained for MILLER's person. FBI agents transported MILLER to a local hospital. After an initial intake examination, a doctor directed x-rays be taken of MILLER. After the x-rays were taken, the doctor advised agents the x-rays did not show any items in MILLER's digestive or anal area. The doctor further advised the agents that the doctor would not conduct any further search of MILLER out of concern that a physical search of MILLER's anal cavity could endanger MILLER's health. Agents transported MILLER back to ACC-East where he was placed in dry-cell protocol. MILLER denied having any contraband to the agents.

19.     DOC's definition of dry-cell protocol involves a segregated camera cell where close prisoner monitoring is conducted to ensure contraband does not enter the general population of the institution. Prisoners are placed in the cell with minimal belongings and their bodily functions are closely observed for a period of time deemed sufficient to either recover any suspected contraband, or make a positive determination that the prisoner does not have any contraband. (DOC Policies and Procedures #811.04 dated 12/22/16.)

20.     On 3/20/2017, DOC advised the FBI that MILLER's dry-cell process had concluded and had produced no contraband.

21.     On 3/21/17, KARJALA emailed a DOC ACC-East sergeant the following, "I would like to visit Mr. MILLER today along with the other clients

MAY 1 0 2017

mentioned yesterday. However, I want to do everything I can so that he is not dry celled or taken for x-rays. Therefore, is some way that we should sit or keep some specified distance from each other because I have some legal paperwork to give him and he needs to give me his copy of the warrant along with his grievances etc., but I don't want paperwork mistaken for contraband. For instance, should I shake it out before handing it to him?" The DOC ACC-East sergeant replied to KARJALA's email and wrote: "Hello Kit – As long as everything is done professionally and staff doesn't think otherwise there should be no problems with your visit...."

### *KARJALA and MILLER's 5/2/17 meeting*

22. On 5/2/17 at 4:32pm, a green Ford Fiesta parked in ACC-East's parking lot. (Agent's note: A review of a State of Alaska Department of Motor Vehicles (DMV) database lists KARJALA as the sole registered owner of a green, Ford Fiesta, bearing Alaska license plate number GGA915.)

23. KARJALA signed into the front desk at ACC-East and asked for professional visits with two inmates, Inmate C and MILLER. Because KARJALA requested professionals visit with both inmates, DOC permitted KARJALA to meet with them in a room with no physical barriers separating them. KARJALA met with each inmate separately, but used the same room for both visits, which was the same room where she had met with Inmate B on 1/13/17, and with MILLER on 2/22/17 and 3/16/17, as described above. KARJALA met with MILLER for approximately 1 hour and 14 minutes beginning at approximately

MAY 1 0 2017

6:08pm. The video-only footage of KARJALA's 5/2/17 meeting with MILLER is summarized below. (Agent's note: The times noted are those reflected on the camera footage.):

    a. At 5:04pm, KARJALA is escorted into the visiting room by a DOC corrections officer. Inmate C is already in the visiting room, seated with his left ankle secured to the wall restraint and the back of his chair facing the back wall. Once KARJALA arrives, she repositions the other two chairs in the room. She places one chair immediately to the right of the inmate's chair, so that its back is facing the security camera. KARJALA places the remaining chair in front of the inmate's chair, with its back facing the door, and uses it as a table.

    b. At 6:04pm, after KARJALA's meeting with Inmate C concludes, Inmate C is escorted from the visiting room by a DOC corrections officer.

    c. At 6:08pm, MILLER is escorted into the visiting room and secured to the wall restraint. MILLER sits in the same chair that Inmate C had occupied. The chairs remain in the same position as they were during the previously described visit with Inmate C.

    d. At 7:09:13pm, KARJALA crosses her left leg over her right leg with her left ankle resting on her lower thigh. KARJALA has a stack of documents in her lap. MILLER has a folder with documents resting on his right thigh.

    e. At 7:09:15pm, KARJALA appears to put her right hand under the documents in her lap, while her left hand is holding the documents in her lap.

    f. At 7:09:28pm, MILLER places the folder of documents resting on his thigh, on the ground in front of him.

    g. At 7:09:33pm, KARJALA brings her right hand above the documents in her lap and rests her right hand on the documents in her lap.

    h. At 7:09:42pm, KARJALA places documents over her right hand. KARJALA moves other documents around her lap at that time.

i.   At 7:09:49pm, MILLER picks up documents that were on the floor in front of him and places them back on his right thigh.

j.   As depicted in the screen shot set forth below, starting at 7:10:14pm, KARJALA hands MILLER a stack of documents with both of her hands.  (Agent's note:  From the way KARJALA handed MILLER the documents, it appeared KARJALA was ensuring that MILLER grabbed item(s) concealed under the documents.)



k.   At 7:10:15pm, MILLER takes the documents from KARJALA.  (Agent's note:  It appeared MILLER grabbed the documents from KARJALA in a manner that indicates he was securing an item(s) under the documents with his left hand.)

l.   At 7:10:21pm, while MILLER appears to examine the documents that KARJALA handed to him, MILLER appears to move his left hand to his lap area.  MILLER crosses his right leg over his left leg, and rests his right ankle on his left thigh.

//

//

//

//

m. As depicted in the screen shots set forth below, at 7:10:24pm, KARJALA stands directly between MILLER and the glass door, shielding MILLER from view from the hallway window and door, and at 7:10:30pm gestures expressively facing away from MILLER, again shielding MILLER while he conceals item(s).





n. As depicted in the screen shot set forth below, at 7:10:37pm, with his left hand still concealed in his lap, MILLER lifts his left leg off the ground. (Agent's note: From the way MILLER lifts his leg and his upper body movements thereafter, I believe MILLER was using his left hand to conceal item(s) in his anal cavity at this point.)



o. At 7:10:54pm, MILLER removes his left hand from his lap area and holds the documents with both hands.

p. At 7:11:02pm, MILLER crosses his right leg over his left leg with his right ankle resting on his left thigh. MILLER then places the documents in his right hand over his lap and places his left hand underneath the documents so it is not visible on the recording. KARJALA continues to stand in front of MILLER in an apparent effort to block him from view from the hallway. (Agent's note: It appears that MILLER was having difficulty concealing the item(s) at that point and had to readjust the item(s) in his anal cavity.)

q. At 7:11:20pm, MILLER appears to bring his left hand out from his lap area and from underneath the documents, and then holds the documents with both hands.

r. At 7:11:56pm, MILLER again places his left hand underneath the documents in his lap, which he continues to hold in his right hand. KARJALA continues to stand in front of MILLER. (Agent's note: It appears that MILLER was still having difficulty concealing the

*KFM*

MAY 1 0 2017

item(s) at that point and had to readjust the item(s) in his anal cavity.)

s. As depicted in the screen shot set forth below, at 7:12:17pm, MILLER raises is left leg, extends it, and then rests it on his right knee, while his left hand remains underneath the documents in his lap and KARJALA continues to shield him with her body.



t. At 7:12:21pm, MILLER holds the documents in his lap with both hands.

u. At 7:16:16pm, KARJALA sits back down in her chair.

//

//

//

//

//

//

//

KFM

MAY 10 2017

v. As depicted in the screen shot set forth below, at 7:20:24pm, MILLER stands up for the first time after KARJALA handed him the stack of papers using both her hands. When MILLER does so, his pants are below his rear end and his boxer shorts are visible.



w. As depicted in the screen shot set forth below, at 7:20:36pm, MILLER pulls up his pants.



x. At 7:22pm, MILLER and KARJALA completed their visit and a corrections officer escorted KARJALA from the interview room and allowed to leave ACC-East without being questioned.

26 of 33

**MILLER undergoes DOC dry-cell protocol from 5/2/17-5/5/17 and excretes heroin and suspected Suboxone, and other foreign objects**

24. On 5/2/17 at approximately 8:00pm, MILLER was brought to the booking unit from the segregation unit for suspicion of having contraband. MILLER was placed in the body scanner where a suspicious item appeared. MILLER was strip searched and placed in a jump suit used for inmates in dry-cell. MILLER was then placed in dry-cell protocol by DOC. The cell MILLER was placed in had a video camera. No audio was recorded.

25. On 5/3/17 at approximately 7:20pm, MILLER was having a conversation with DOC personnel. During the conversation, the DOC employee told MILLER to give up what he had. MILLER stated, it would be trouble and new charges if he did that. MILLER was asked again to give it up and MILLER again stated that it would be trouble.

26. On 5/4/17 at 12:18pm, DOC personnel received an email from KARJALA. In the email, KARJALA stated, "I tried to visit Christopher Miller in Seg [the Segregation Unit, where MILLER was housed at ACC-East] on Tuesday[4] [*sic*] afternoon but was told he was in booking. This to me translates to a 'dry cell' or transport. Every time he comes out of dry cell, he has injuries both internal and visible external bruises, scrapes, lumps, so I am asking ahead of time

---

[4] Although KARJALA's email states that she tried to visit MILLER on "Tuesday afternoon," that appears to be a typo given that KARJALA met with MILLER as noted above the evening of Tuesday, 5/2/17, and DOC personnel confirm that KARJALA tried to visit MILLER the following day, 5/3/17, after he had been placed in dry-cell protocol.

to bring in a camera to photograph his condition. Even if he has no visible wounds, I would like to photograph his condition. And this request is for tomorrow as well." DOC personnel confirmed KARJALA visited ACC-East on Wednesday 5/3/17 following her 5/2/17 visit with MILLER.

27.     On 5/4/17 at 2:28pm, KARJALA faxed a request for an Emergency Bail Hearing to the Superior Court for the State of Alaska on MILLER's behalf in case number 3AN-16-01248CR. In her emergency request, KARJALA stated: "[MILLER] is being treated with cruel and unusual punishment and has already sustained injuries from this treatment in the past and some may be permanent." KARJALA stated the information was not presented at a previous hearing was because she had: "just learned of this information and do not want it to continue over the weekend."

28.     On 5/4/17, at approximately 6:50pm, MILLER passed a bowel movement, which DOC inspected and found to contain foreign objects that were white and orange in color with the consistency of a wet paper like product. The orange objects' appearance was consistent with Suboxone strips. In an effort to identify the orange wet paper like substance, DOC personnel tested a sample using a field test. The results from the field test, although not definitive, were consistent with Suboxone. A short time before MILLER passed this bowel movement, DOC offered MILLER a laxative and he accepted it.

//

MAY 1 0 2017

29.     On 5/4/17, at approximately 7:37pm, MILLER asked a DOC corrections officer who was monitoring him if the officer was with the FBI. When the corrections officer said no, MILLER stated that he was "very concerned about new charges."

30.     On 5/4/17, at approximately 9:30pm, DOC asked MILLER to provide a urine specimen for testing. MILLER complied and provided a sample. The sample tested positive for Amphetamines, Methamphetamines, and Opiates. A secondary test was performed on the sample in the presence of MILLER and it too tested positive for Amphetamines, Methamphetamines, and Opiates. MILLER declined to have DOC send the sample tested at a laboratory for confirmation. MILLER admitted to DOC personnel that he had consumed methamphetamine and heroin within the previous 30 days.

31.     On 5/5/17, at approximately 12:30am, MILLER provided a second bowel movement, which DOC inspected and found to contain foreign objects that were white and orange in color with the consistency of a wet paper like product. The orange objects' appearance was consistent with Suboxone strips.

32.     On 5/5/17, at approximately 2:28am, MILLER began to dig at his Tyvek suit, which appeared to have a hole torn in the area below MILLER's groin area. More specifically, MILLER placed his hand through the hole and reached into the area around his anal cavity. (DOC had previously had MILLER change from his standard prison garments and into a jumpsuit on 5/2/17 when he was placed in dry-cell protocol. On 5/4/17, DOC had MILLER change out of the

MAY 1 0 2017

jumpsuit and into a Tyvek suit. DOC uses Tyvek suits to help prevent inmates from retrieving, and concealing contraband elsewhere.) After a few minutes, MILLER appears to remove an item from his groin area and place it in his left armpit.

33.     On 5/5/17, at approximately 3:00am, MILLER provided a third bowel movement, which DOC inspected and found to contain a small mesh like bag that appeared to be empty.

34.     On 5/5/17, at approximately 4:54am, MILLER pulled an unknown item from his left armpit and appeared to unwrap it. DOC personnel, who were observing MILLER handling the object from outside of the cell, directed MILLER to surrender the object to them. MILLER complied, placing the object into a collection bucket through the food tray door. Upon closer inspection, DOC personnel determined that the object was "a balloon with band aids attached to it and two small plastic jars that contained a putty like brown substance." Subsequently, the substance inside the object that MILLER surrendered field tested positive for heroin. Based on my training, experience, and consultation with other law enforcement officers familiar with drug distribution inside DOC facilities, the heroin concealed in these jars contained a distributable quantity of that controlled substance.

35.     On 5/5/17, at approximately 9:20am, MILLER provided a fourth bowel movement, which DOC inspected and found to contain what appeared to be

MAY 1 0 2017

a band aid and a few other items that did not match the consistency of the rest of the bowel movement.

36.     On 5/5/17, at approximately 1:15pm, MILLER produced a fifth bowel movement, which DOC inspected and found to contain a small zip lock bag that had a dark substance inside, along with a small dark colored piece of cloth. The dark substance was not field tested but will be sent to the laboratory for examination.

37.     On 5/5/17, at 2:15pm, MILLER produced a sixth bowel movement, which DOC inspected and concluded that it did not contain any apparent contraband or other foreign objects.  MILLER was thereafter removed from dry-cell protocol and escorted back to his jail cell.

38.     The foreign objects and suspected contraband seized by DOC from MILLER during the dry-cell protocol described above are being processed by the FBI and will be sent to a laboratory for further examination, including testing for drug identification and net weight.

//

//

//

//

//

//

//

*Preliminary analysis of relevant financial records*

39.     Records obtained by the FBI from Credit Union 1 for MILLER's bank account for the period covering 11/1/16 through 12/31/16 reveal multiple cash deposits of between $100 and $800.  (As noted above, MILLER was an ACC inmate during that time.)

40.     Records obtained by the FBI from Alaska USA Federal Credit Union for Inmate B's Alaska USA bank account for the period 4/22/16 through 11/16/16 reveal:

    a.   multiple cash deposits of between $25 and $200;

    b.   multiple electronic deposits into Inmate B's Alaska USA account from other inmates at ACC, or from relatives of ACC inmates and;

    c.   electronic transfers from Inmate B's bank account to KARJALA[5] including:

        i.     July 2016 – $3,900 transferred to M.K. (KARJALA's adult son, who open source records indicate lives at KARJALA's Anchorage residence);

        ii.    August 2016 - $500 transferred to KARJALA

        iii.   October 2016 - $2400 transferred to KARJALA

//

//

//

---

[5] As noted above, there is no indication that KARJALA has ever represented Inmate B in any state or federal matter, per Alaska State Court System online records and online records of the United States District Court for the District of Alaska.

## Conclusion

41.     Based on the forgoing, I respectfully submit that probable cause exists to believe that **KIT LEE KARJALA** and **CHRISTOPHER BRANDON MILLER** have committed violations of 21 U.S.C. § 846 (drug conspiracy), 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (distribution of, and possession with intent to distribute, controlled substances), and 18 U.S.C. §§ 1791(a), (b)(2), (b)(4) (providing and possessing contraband in a prison).

Signature Redacted

_____
Special Agent Richard Fuller
Federal Bureau of Investigation

Sworn and subscribed before me this 10___ day of May 2017.

/s/ Kevin F. McCoy
United States Magistrate Judge
Signature Redacted

_____
Honorable Kevin F. McCoy
UNITED STATES MAGISTRATE JUDGE

KFM

MAY 1 0 2017